**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NORDSTROM CONSULTING, INC. and STEVEN NORDSTROM, | |
| Plaintiffs, | |
| v. | No. 18-cv-03011 |
| INNOVA SYSTEMS, INC. and CHERYL NORDSTROM, | Judge Franklin U. Valderrama |
| Defendants. | |

**SEALED MEMORANDUM OPINION AND ORDER**[1]

This is a copyright and trademark infringement case involving vision testing

systems. Plaintiffs Nordstrom Consulting Inc. (NCI) and Steven Nordstrom (Steven)

(collectively, Plaintiffs) assert that they are the registered owners of specific

copyrights and that Defendants Innova Systems, Inc. (Innova) and Cheryl Nordstrom

(Cheryl) (collectively, Defendants) have infringed these rights by removing Plaintiffs'

name on the copyrights and substituting their own. R. 69, First Amended Complaint

(FAC).[2] Plaintiffs also ask the Court to order the U.S. Patent and Trademark Office

(USPTO) to issue a certificate of correction naming Steven as the inventor of United

---

[1]Portions of the parties' briefs were filed under seal, as were several exhibits. Because this Order may contain privileged information that was submitted to the Court under seal, the Court will issue its Order under seal so the parties may meet and confer with one another about proposed redactions. The parties are to file a joint position statement by October 7, 2025, explaining what (if any) redactions are needed in the text of the Order, and why (bearing in mind the strict standard against secret filings, *see generally Mitze v. Saul*, 968 F.3d 689 (7th Cir. 2020)). That position statement may be filed under seal. After considering the proposed redactions, the Court will issue a public version of the Order.

[2]Citations to the docket are indicated by "R" followed by the docket number and, where necessary, a page or paragraph citation.

States Patent Nos. 9,833,137 ('137 Patent) and 9,883,794 ('794 Patent) (together, the Patents). *Id.*

Before the Court is Defendants' Motion for Summary Judgment on: (1) Plaintiffs' inventorship claims (Counts IV and V), as well as Defendants' counterclaim for a declaratory judgment that Steven is not an inventor of the Patents (Counterclaim I); (2) Plaintiffs' invalidity claims (Counts VI and VII); (3) Plaintiffs' copyright infringement claim (Count I); (4) Plaintiffs' Digital Millenium Copyright Act (DMCA) claim (Count II), as well as Defendants' DMCA counterclaim (Counterclaim VI); (5) Plaintiffs' Lanham Act claim (Count III); and (6) Defendants' counterclaims for federal and state trademark infringement and unfair competition (Counterclaims VIII, IX, and X). R. 191, Defs.' Mot. SJ. For the reasons stated below, the Court denies Defendants' Motion for Summary Judgment as to Plaintiffs' Counts I (Copyright Act), II (DMCA), III (Lanham Act), and V (inventorship of the '794 Patent), and Defendants' Counterclaims VI (DMCA) and VIII–X (federal and state trademark infringement and unfair competition), and grants the Motion as to Plaintiffs' Count IV (inventorship of the '137 Patent) and Counts VI and VII (validity of both Patents).

## Background[3]

### I.   Motion to Strike

Before reciting the material facts underlying Defendants' summary judgment motion, the Court must address what evidence it can consider. In support of their

---

[3]This factual background is taken from the parties' Rule 56.1 statements of facts and responses, including Defendants' Statement of Facts (R. 193, DSOF); Plaintiffs' Response to

motion for summary judgment, Defendants submitted a declaration from Cheryl. R. 191-1, Cheryl Decl. In response, Plaintiffs submitted a declaration from Steven. R. 198-1, Steven Decl. Defendants then filed a reply declaration from Cheryl in conjunction with Defendants' reply brief. R. 213, Cheryl Reply Decl. Plaintiffs subsequently filed a motion to strike Cheryl's reply declaration. R. 214, Pls.' Mot. Strike. The Court addresses the fully briefed motion to strike as a threshold matter to Defendants' summary judgment motion.

Generally, the Court will not consider arguments raised by parties for the first time in a reply brief or declaration. *See Narducci v. Moore*, 572 F.3d 313, 323 (7th Cir. 2009); LR 56.1(f). However, if the nonmoving party's opposition brief places new matters at issue, the moving party may be able to address the newly raised matters in its reply brief. *Maher v. Rowen Grp., Inc.*, 2015 WL 273315, at *8 (N.D. Ill. Jan. 20, 2015). The Court has broad discretion to ensure compliance with Local Rules. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

Plaintiffs ask the Court to strike Cheryl's reply declaration, or in the alternative, allow them to file a sur-reply to address the alleged new evidence presented in Cheryl's reply declaration. Pls.' Mot. Strike at 4. They argue that Cheryl's reply declaration violates Local Rule 56.1 by raising new evidence and that Defendants improperly cite to Cheryl's reply declaration in their own Reply brief. *Id.*

---

Defendants' Statement of Facts (R. 202 at 1–21, Pls.' Resp. DSOF); Plaintiffs' Statement of Additional Facts (R. 202 at 22–30, PSOAF); and Defendants' Response to Plaintiffs' Statement of Additional Facts (R. 212, Defs.' Resp. PSOAF).

at 1; R. 211, Defs.' Reply. Additionally, posit Plaintiffs, Cherly's reply declaration contains improper expert opinion that should be barred. Pls.' Mot. Strike at 2–3.

Defendants counter that: (1) Cheryl's reply declaration falls under the exception to Local Rule 56.1 because she included specific paragraph numbers correlating to Steven's Declaration; (2) Cheryl's reply declaration does not contain improper expert opinion; and (3) the Court should deny Plaintiffs' motion to strike because Plaintiffs did not meet and confer with Defendants before filing the motion. R. 216, Defs.' Resp. Strike.

The Court briefly addresses Defendants' argument that the motion should be denied because Plaintiffs failed to confer with Defendants prior to filing the motion to strike, in violation of the Court's Standing Order governing motion practice. Defs.' Resp. Strike. It is true that the Court often requires strict compliance with the meet-and-confer requirement; however, there are exceptions to the rule, including for "motions for leave to file a sur-response (where such request is based upon the argument that the opposing party raised new arguments in its reply)." *See* Valderrama, J. Standing Order on Motion Practice. A motion to strike a reply declaration, with an alternative request for leave to file a sur-response, is close enough to this exception that the Court will not deny Plaintiffs' motion to strike solely because they failed to meet and confer with Defendants before filing it.

The Court turns to Plaintiffs' argument that Cheryl's reply declaration should be stricken as impermissible new evidence. Pls.' Mot. Strike at 3–4 (citing *inter alia*, *Gilbert v. I.C. Sys., Inc.*, 2021 WL 292852, at *3 (N.D. Ill. Jan. 28, 2021) (striking new

affidavit submitted with reply brief to motion to compel, reasoning that "[i]t can hardly be disputed that the Hansen Declaration is new evidence that was not contained in [defendants'] opening Motion.")).

In response, Defendants rely heavily on *Soelect, Inc. v. Hyundai Am. Tech. Ctr., Inc.*, 2024 WL 2892905, at *5 (N.D. Ill. June 10, 2024). In *Soelect*, the court denied a motion to strike declarations submitted along with the defendant's reply in support of its summary judgment motion, finding that the declarations were "offered to rebut statements made in a declaration submitted by Dr. Cho to oppose [defendant's] motion for summary judgment," and therefore fell within the "exception to the rule that a party may not introduce additional facts or evidence in a reply in circumstances where the replying party is responding to matters placed at issue by the nonmoving party's opposition brief." 2024 WL 2892905, at *5. Here, Defendants point out that Plaintiffs' statement of additional facts cites "22 paragraphs" of Steven's declaration, as well as other materials, thus allegedly making it "impossible" for Defendants to respond without introducing new statements and opinions in the form of Cheryl's reply declaration. Defs.' Resp. Strike at 4. However, the *Soelect* decision permitted reply affidavits only where they directly "rebut statements made in a declaration submitted by [the opposing party]" and thus created "no potential for unfair surprise." *Soelect*, 2024 WL 2892905, at *5. Here, by contrast, Defendants fail to specify any new arguments or evidence raised by Steven's declaration that justify the introduction of previously undisclosed expert opinions. Instead, they broadly cite numerous paragraphs and materials without demonstrating which exact issue they

5

are responding to, thereby improperly attempting to leverage the narrow exception articulated in *Soelect*.

Further, Defendants' reliance on *Baugh v. City of Milwaukee*, 823 F. Supp. 1452, 1457 (E.D. Wis. 1993) and *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 n.* (7th Cir. 1996) is misplaced, as these cases merely allowed reply affidavits to clarify or directly address specific points first raised by the opposing party—such as "additional pages of deposition transcripts to clarify portions of those depositions," *Baugh*, 823 F. Supp. at 1457. Neither decision permits a generalized and non-specific introduction of entirely new expert opinions without explicit linkage to specific points first raised by the opposing party. Thus, Defendants' expansive and vague references fail the specificity requirement emphasized in *Soelect*, rendering their reliance on these cases similarly inappropriate.

Here, because Cherly's reply declaration does not merely respond to new matters raised in Plaintiffs' opposition, the Court will not consider it as evidence supporting summary judgment, and thus grants the motion to strike. Accordingly, the Court need not address Plaintiffs' argument that Cheryl's reply declaration contains improper expert opinions.

## II.    Factual Background

The undisputed facts set forth within this Order are set forth as favorably to Plaintiffs, the non-movant, as the record and Local Rule 56.1 permit. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the Court assumes

the truth of those facts, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Neither party included a background section in their summary judgment briefs—Defendants simply point to their statement of facts, and include a summary of the claims and counterclaims in their summary judgment motion, Defs.' Mot. SJ at 1–2, while Plaintiffs skip a background section altogether, R. 198, Pls.' Resp. The Court therefore gives only a brief recitation of the facts here, and addresses the specifics relevant to each claim and counterclaim within the analysis.

NCI designs, develops, markets, and licenses software and sells complete systems for vision testing. FAC ¶ 3. Steven is the president and sole owner of NCI. *Id.* ¶ 4. Innova markets, sub-licenses, and distributes software systems for vision testing developed by NCI, as well as software systems for vision testing developed by Innova. *Id.* ¶ 5; R. 73, Answer ¶ 5. Cheryl is the president and sole owner of Innova. FAC ¶ 6.

At issue in this lawsuit is copyrighted software code and programs, including the "Rabin Cone Contrast Test"; the '794 Patent, covering a method and apparatus for testing for color vision loss and naming Cheryl as a co-inventor; and the '137 Patent, claiming a method and apparatus directed toward a low luminance dysfunction test, and naming Cheryl as the sole inventor. Defendants have moved for summary judgment on all counts of Plaintiffs' First Amended Complaint, as well as Defendants' Counterclaims VI, XII, IX, and X. Defs.' Mot. SJ. For the following

reasons, the Court grants in part and denies in part Defendants' summary judgment motion.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

### I.  Inventorship of 'the Patents – Plaintiffs' Counts IV and V and Defendants' Amended Counterclaim I

Plaintiffs' Counts IV and V seek to add Steven as an inventor of the Patents. *See* FAC. Defendants' Amended Counterclaim I seeks a declaratory judgment that Steven is not an inventor of the Patents. R. 59, Am. Counterclaim. Under 35 U.S.C. § 256(a), the Director of the USPTO may, on petition, correct inventorship when "an inventor is not named in an issued patent" through error. Subsection (b) further empowers a court, after notice and a hearing, to "order correction of the patent," with the Director then issuing a conforming certificate.

Defendants argue that the Patents already list the correct inventors: Cheryl Nordstrom as sole inventor of the '137 Patent, and Cheryl Nordstrom, Jeffrey Rabin, and John M. Gooch as co-inventors of the '794 Patent. DSOF ¶¶ 6–8. Each named inventor executed an inventor's oath. *Id.* ¶ 8. Defendants further contend that Steven merely wrote software code while working with Innova, and that writing code does not amount to "conception." *Id.* ¶¶ 11–12. Defendants note that Steven was unable to identify a definite date of conception for the '794 Patent and testified that he did not originate certain claimed elements, such as the graphical representation in Claim 1(h). *Id.* ¶ 21.

Plaintiffs respond that while the patents list Cheryl Nordstrom ('137 Patent) and Cheryl Nordstrom, Jeffrey Rabin, and John M. Gooch ('794 Patent) as inventors, those listings are improper. Pls.' Resp. DSOF ¶¶ 6–7. According to Plaintiffs, Steven was "extensively involved in the development of the invention[s] claimed in the"

Patents.[4] PSOAF ¶¶ 3–4. Plaintiffs contend that Steven's contributions went beyond programming, as he testified that "these are all computerized methods . . . [a]nd I created the entire computerized method" claimed in the '137 Patent. Pls.' Resp. DSOF ¶ 19. Plaintiffs further argue that Steven began developing the relevant software before Innova was formed, while employed at his own consulting firm. *Id.* ¶ 15. They dispute Defendants' characterizations of Steven's testimony, maintaining that his statements reflect conceptual contributions to both Patents, including the overall computerized methods and reporting features. *Id.* ¶¶ 20–21. Therefore, argue Plaintiffs, a question of fact exists as to whether Steven was a joint inventor of the Patents. Pls.' Resp. at 3–7.

"Joint inventorship under [35 U.S.C.] § 256 requires 'at least some quantum of collaboration or connection' between the listed inventors and the claimed co-inventor." *Maxtech Consumer Prods., Ltd. v. Robert Bosch Tool Corp.*, 255 F. Supp. 3d 833, 846–47 (N.D. Ill. 2017) (quoting *Kimberly–Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992)). "A joint inventor must: (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the

---

[4]Steven also testified that he was an inventor of both Patents, PSOAF ¶¶ 1–2; as discussed in more detail in the Court's Order on Defendants' Motion to Exclude the Expert Report and Testimony of Steven, R. 190, that is an improper legal opinion that the Court will not consider. Nor will the Court consider Cheryl's testimony that she is the sole inventor of the invention claimed in the '137 Patent. DSOF ¶ 11.

current state of the art." *In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018) (cleaned up).[5]

"Because co-inventors need not make a contribution to the subject matter of every claim of the patent, 35 U.S.C. § 116, inventorship is determined on a claim-by-claim basis." *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1302 (Fed. Cir. 2002). An inventorship analysis has two steps: first, "a construction of each asserted claim to determine the subject matter encompassed thereby" and second, "compar[ing] the alleged contributions of each asserted co-inventor with the subject matter of the properly construed claim to then determine whether the correct inventors were named." *Id.* The issue of joint inventorship is "fact specific, and no bright-line standard will suffice in every case." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997).

Because courts presume that issued patents correctly name their inventors, "the burden of showing misjoinder or nonjoinder of inventors is a heavy one." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998) (cleaned up). The Federal Circuit has explained that "the alleged co-inventor must prove their contribution to the conception of the claims by clear and convincing evidence." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998) (cleaned up); *see also Stern v. Trs. of Columbia Univ. in City of New York*, 434 F.3d 1375, 1377 (Fed. Cir. 2006) (on defendant's summary judgment motion, a plaintiff seeking to be added as an inventor

---

[5]This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

has "the burden of showing by clear and convincing evidence, after all reasonable inferences [are] drawn in his favor, that he [is] an inventor of the" patent). Moreover, "an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof," because "an alleged co-inventor must supply evidence to corroborate his testimony." *Ethicon*, 135 F.3d at 1461 (cleaned up). Courts judge whether the corroboration suffices under a "rule of reason" analysis, which requires them to evaluate "all pertinent evidence" to reach "a sound determination of the credibility of the alleged inventor's story." *Id.* (cleaned up).

With those inventorship principles in mind, the Court now considers the inventorship of the Patents, starting with the '794 Patent.

## A. Inventorship of the '794 Patent

Before analyzing inventorship of the '794 Patent, the Court briefly recaps the earlier claims and named inventors, because the '794 Patent claims priority to two provisional and two non-provisional applications.

As background, U.S. Patent Application Serial No. 14/819,046 ('046 Application), filed on August 5, 2015, led to the issuance of U.S. Patent No. 9,883,794 ('794 Patent) on February 6, 2018. PSOAF ¶¶ 12–14. It lists Cheryl, Jeffrey Rabin (Rabin), and John M. Gooch (Gooch) as inventors and claims priority, as a continuation, to U.S. Patent Application Serial No. 14/251,286 ('286 Application). *Id.* ¶¶ 14, 16. The '286 Application, filed on April 11, 2014, lists the same inventors and in turn claims priority, as a continuation, to U.S. Patent Application Serial No.

13/887,272 ('272 Application). *Id.* ¶ 16. The '272 Application, filed on May 3, 2013, lists Steven, Cheryl, and Rabin as inventors and further claims priority to two provisional applications:

    1. U.S. Provisional Application No. 61/642,292 ('292 Provisional), naming Steven and Cheryl; and

    2. U.S. Provisional Application No. 61/642,378 ('378 Provisional), also naming Steven and Cheryl. *Id.* ¶ 12.

The diagram below illustrates the priority chain among the '794 Patent, the '286 Application, the '272 Application, and the two provisional applications (i.e., the '292 Provisional Application and '378 Provisional Application).



As the priority chain shows, when filed, the non-provisional '272 Application added Rabin. When filed, the next continuation—the '286 Application—removed Steven and added Gooch. When filed, the following continuation—the '046 Application—carried the same inventorship forward, resulting in '794 Patent to issue with three named inventors: Cheryl, Rabin, and Gooch.

Plaintiffs contend that claims 6 and 7 of the '272 Application (the last application naming Steven) and the '794 Patent share similar claim language, as shown in the following tables. *Id.* at 6; R. 190-1, Steven Report ¶ 75 (emphasis added in Claim 6 to show the difference).

| Claim 6 of the '272 application | Claim 6 of '794 Patent |
| --- | --- |
| The computerized method for administering a color vision test in a patient recited in claim 1, further comprising the steps of periodically verifying a calibration of said first color and said first contrast level of said first character to be displayed on said display, where said verifying is accomplished by software *and, if necessary, preventing other software applications from interfering with said calibration.* | The computerized method for administering a color vision test in a patient recited in claim 1, further comprising the steps of periodically verifying a calibration of said first color and said first contrast level of said first character to be displayed on said display, where said verifying is accomplished by software. |

| Claim 7 of the '272 application | Claim 7 of '794 Patent |
| --- | --- |
| The computerized method for detecting color vision loss in a patient recited in claim 6, wherein the step of verifying a calibration is automatic if said calibration fails. | The computerized method for detecting color vision loss in a patient recited in claim 6, wherein the step of verifying a calibration is automatic if said calibration fails. |

And with regard to claim 25 of the '794 patent, Plaintiffs assert that when counsel asked Cheryl to identify each co-inventor's contribution, she responded, "[Claim] 25 is Gooch." Pls.' Resp. at 7 (quoting R. 206-2, Cheryl Dep. at 86–87). Counsel later asked whether Gooch's only contribution to the '794 patent was claim 25, and Cheryl answered, "Yes." *Id.* The '272 Application (which did not name Gooch) and the '794 Patent present identical versions of Claim 25, as shown below, except for the capitalization of the "C" in "Claim 1."

| Claim 25 of the '272 application | Claim 25 of '794 Patent |
|---|---|
| The computerized method for detecting color vision loss in a patient recited in Claim 1, wherein said first character is a symbol. | The computerized method for detecting color vision loss in a patient recited in claim 1, wherein said first character is a symbol. |

For additional comparison, the table in **EXHIBIT A** presents the claims as filed in the '272 Application, the '286 Application, and the '046 Application (later issuing as the '794 Patent). This side-by-side chart implements the governing two-step inventorship analysis: first construe the claims, then compare each alleged contribution to the subject matter of the properly construed claims. *Trovan*, 299 F.3d at 1302. Each application includes the same claim set—except dependent claims 6 and 31—but the inventor roster changed, with Gooch replacing Steven between the first and second filings.

In dependent claims 6 and 31, between the '272 and '286 filings only one expressly conditional step was deleted: "and, *if necessary*, preventing other software applications from interfering with said calibration" (emphasis added). Defendants argue that the omission of this language in the '286 Application, which resulted in the '794 Patent, demonstrate that Steven's contribution was not claimed in the '794 Patent. Defs.' Mot. SJ at 7–8. The Federal Circuit has made clear, however, that "as a matter of linguistic precision, optional elements do not narrow the claim because they can always be omitted." *In re Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006).

Because the operative claim language—and therefore the conception of the claimed subject matter—remained unchanged from the '272 Application forward, any individual who was an inventor of the '272 claims necessarily remained an inventor

of the identical claims in the continuations. Unchanged dependent claims preserve the underlying conception; inventorship remains claim-specific. *Trovan*, 299 F.3d at 1301–02; *Fina Oil*, 123 F.3d at 1473. The unexplained removal of Steven and addition of Gooch therefore creates a genuine dispute of material fact as to whether the named inventors on the '794 Patent accurately reflect the true inventorship of those claims. Inventorship is a "mixed question of law and fact," where "[t]he overall inventorship determination is a question of law, but it is premised on underlying questions of fact." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004). On this record, the Court cannot resolve those fact questions as a matter of law and must submit them to the trier of fact.

Plaintiffs need only show a genuine dispute of material fact, not yet carry their ultimate "clear-and-convincing" burden under *Pannu* and *Ethicon*. They have done so with contemporaneous evidence that a rational factfinder could view as demonstrating misjoinder: (1) the nearly identical claims (save for two changed dependent claims) between the '272 Application naming Steven and the '794 Patent, and (2) Cheryl's testimony that Gooch conceived claim 25 of the '794 Patent even though that identical text appeared in the earlier '272 filing naming only Steven and Cheryl Nordstrom—and not John M. Gooch—as inventors.

Moreover, Plaintiffs point to evidence showing Steven's collaboration on the claims of the '794 Patent. Pls.' Resp. at 3–4 (citing Steven Decl. ¶ 48 (Rabin's December 26, 2010 email transmitting "updated ColorCal programs to pre-calibrate Netbook CCTs" and lauding Steven's "incomparable expertise."); *id.* ¶ 53 (Rabin's

February 6, 2011 email noting Steven was "working hard to get the Spyder3 to do what we intend."); *id.* ¶ 55 (Rabin's February 14, 2011 email directing specific calibration values to balance detection and false positives and thanking Steven for his "expertise."). These contemporaneous documents corroborate Steven's involvement in the "verifying a calibration" limitation expressly recited in claims 6 and 7, which limitation remained substantively the same across the chain. *See Ethicon*, 135 F.3d at 1461 (rule-of-reason corroboration); *Blue Gentian, LLC v. Tristar Prods., Inc.*, 70 F.4th 1351, 1357 (Fed. Cir. 2023) (consider all pertinent evidence); *Trovan*, 299 F.3d at 1301–02 (claim-by-claim analysis; more than one's own testimony). Coupled with the identical dependent-claim text that traveled from the '272 filing through to the '794 patent—and the unexplained swap of Steven for Gooch on the '286 Application—this record raises a triable dispute as to who conceived the calibration step, precluding summary judgment on inventorship for the '794 Patent. *See In re Johnston*, 435 F.3d at 1384 (optional language does not narrow the claim); *Eli Lilly*, 376 F.3d at 1362 (mixed question of law and fact).

To be clear, the application history and the praise-laden emails do not, standing alone, conclusively establish inventorship. *See Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1296 (Fed. Cir. 2008) (questioning evidence that does not show a contributor's idea), *Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1377–78 (Fed. Cir. 2006) (collaboration without claim-level conception is insufficient); *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993) (oral inventor testimony is viewed with skepticism and cannot stand alone). But at summary judgment the

question is whether Plaintiffs have adduced enough corroborated evidence to create a genuine dispute of material fact. The Court finds they have done so.

Finally, the Court considers Defendants' "hired-to-invent" defense, in which they assert that "[e]ven assuming, arguendo, that Steven conceived of some portion of the claims (which he did not), Innova owns the Patents under the long-standing hired-to-invent doctrine." Defs.' Mot. SJ at 9–10 (citing *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933); *Standard Parts Co. v. Peck*, 264 U.S. 52, 59–60 (1924)). The parties both agree that the "hired-to-invent" defense is an affirmative defense. Pls.' Resp. at 8; Defs.' Reply at 5; *see also Vapor Point LLC v. Moorhead*, 832 F.3d 1343, 1355 (Fed. Cir. 2016) (citing *Banks v. Unisys Corp.*, 228 F.3d 1357 (Fed. Cir. 2000)).

Plaintiffs correctly note that the "hired-to-invent" defense "appears nowhere in Defendants' Amended Answer, Affirmative Defenses, or Counterclaims." Pl.'s Resp. at 8. Therefore, argue Plaintiffs, Defendants have waived the defense. *Id.* (citing *Shell Oil Co. v. United States*, 896 F.3d 1299, 1315–16 (Fed. Cir. 2018) (affirmative defense raised for the first time on summary judgment was waived)). Defendants reply that it was encompassed in their Fifth Affirmative Defense of "estoppel." Defs.' Reply at 5. But Defendants' Fifth Affirmative Defense, as pleaded, simply alleges that "Plaintiffs' claims are barred by the doctrine of estoppel." R. 73, Defs.' Ans. at 10. Rule 8(c) requires fair notice of affirmative defenses. *See Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005) ("The purpose of Rule 8(c) of the Federal Rules of Civil Procedure is to give the opposing party notice of the affirmative

defense and a chance to respond."). A generic "estoppel" label does not put Plaintiffs on notice of a distinct ownership/assignment theory. Defendants cannot debut that theory at summary judgment without leave to amend and a showing of no prejudice. *See* Fed. R. Civ. P. 8(c)(1), 15, 16. And, even if the "hired-to-invent" defense could ultimately establish that Innova owns whatever was actually invented, it does not resolve who the true inventors are. Inventorship turns on conception of the claimed subject matter, and ownership doctrines cannot be used to re-label inventorship. *Ethicon*, 135 F.3d at 1460. Accordingly, the Court rejects Defendants' invocation of the hired-to-invent doctrine as a defense to inventorship.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' Count V is denied, as is their motion for summary judgment on Defendants' Amended Counterclaim I denied in part, as to the '794 Patent.

### B. Inventorship of the '137 Patent

As previously explained, issued patents enjoy a strong presumption that the named inventors are correct, and an alleged co-inventor must rebut that presumption with clear-and-convincing evidence corroborated under the Federal Circuit's rule-of-reason framework. *See Pannu*, 155 F.3d at 1349; *Ethicon*, 135 F.3d at 1461. Courts approach alleged-inventor testimony with skepticism; oral testimony, standing alone, cannot satisfy the clear-and-convincing standard, and the purported inventor must offer independent corroboration beyond his own say-so. *Price*, 988 F.2d at 1194;

*Wagner v. Ashline*, 2021 WL 5353889, at *4 (Fed. Cir. Nov. 17, 2021); *Trovan*, 299 F.3d at 1302.

Defendants contend that "Steven has no evidence, corroborated or otherwise, that he contributed to the conception of the subject matter of the '137 Patent which claims a method and apparatus for a LLD test." Defs.' Mot. SJ at 7. Unlike the '794 Patent, Plaintiffs do not argue, nor provide any evidence, that Steven is named as an inventor on any of the applications that make up the '137 Patent's priority chain. *See* Pls.' Resp. Indeed, Steven admitted in his deposition that Cheryl "filed a patent application on something that [he] invented." DSOF ¶ 36 (quoting Steven Dep. at 86–87). It is undisputed that Cheryl was named as the sole inventor on the '137 Patent. Pls.' Resp. DSOF ¶ 6.

In response, Steven sweepingly asserts that he invented "all" parts of claim 1, i.e., 1(a) through 1(k), and contends that "[he] alone created the program that produces the Low Luminance Test." Steven Report ¶ 150; *see* Pls.' Resp. at 2.

It is worth reciting Claim 1 of the '137 Patent:

| Identifier | Claim 1 of '137 Patent |
|---|---|
| Preamble | 1. A computerized method for administering a low luminance dysfunction test to a patient, comprising the steps of: |
| 1(a) | (a) displaying in high contrast a first character in a color at a first acuity level against a display producing a first luminance level, said display driven by said computer; |
| 1(b) | (b) receiving a first input signal from said patient via an input device, where said input signal is indicative of whether said patient recognizes said first character displayed in said first acuity level; |

| 1(c) | (c) displaying in high contrast a second character, being the same or different from the first character, the second character displayed in said color at a second acuity level, differing from the first acuity level, against said display producing said first luminance level, said display driven by said computer; |
| --- | --- |
| 1(d) | (d) receiving a second input signal from said patient via said input device, where said input signal is indicative of whether said patient recognizes said second character displayed at said second acuity level; |
| 1(e) | (e) calculating a first score based on said first and second input signals, said score related to acuity function in said patient's eye to said characters at said first and second acuity levels at said first luminance level; |
| 1(f) | (f) displaying a third character, being the same or different from the first and second characters, in said color at a third acuity level against the display producing a second luminance level, said second luminance level being lower than said first luminance level and selected prior to administering the test to replicate a specific low luminance real environmental condition, where low acuity function in the specific low luminance real environmental condition is used as an indicator of a visual dysfunction, said display driven by said computer; |
| 1(g) | (g) receiving a third input signal from said patient via an input device, where said third input signal is indicative of whether said patient recognizes said third character displayed at said third acuity level at said second luminance level; |
| 1(h) | (h) displaying a fourth character, being the same or different from the first, second, and third characters, in said color at a fourth acuity level, against said display producing said second luminance level, said display driven by said computer; |
| 1(i) | (i) receiving a fourth input signal from said patient via said input device, where said fourth input signal is indicative of whether said patient recognizes said fourth character displayed at said fourth acuity level at said second luminance level; |

| 1(j) | (j) calculating a second score related to acuity function in said patient's eye to said characters at said third and fourth acuity levels at said second luminance level; and, |
|------|------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1(k) | (k) calculating a degree of low luminance dysfunction by calculating a third score representing a difference between said first and second scores. |

As stated above, "[i]nventorship is determined on a claim-by-claim basis, and the proper analysis begins by construing the claims and then comparing each asserted contribution to the construed subject matter; alleged co-inventors must show more than their own testimony. *Trovan*, 299 F.3d at 1301–02.

Plaintiffs point to no evidence as to how Steven conceived any specific claim element. Federal Circuit precedent directs courts not to rely on "conclusory" or "broad" statements when determining inventorship. *Trovan*, 299 F.3d at 1304. Likewise, assertions of "program[ming]" does not equate to inventorship when it merely involves "[t]he basic exercise of the normal skill expected of one skilled in the art, [which] without an inventive act, . . . does not make one a joint inventor." *Fina Oil*, 123 F.3d at 1473.

Courts consistently hold that conclusory 'that's what I invented' statements are insufficient at summary judgment, and a challenger must present clear and convincing evidence that ties his contribution to each claim element. *James v. J2 Cloud Servs., LLC*, 823 F. App'x 945, 948–49 (Fed. Cir. 2020) (affirming summary judgment); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008);

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005); *Tech. Dev. Corp. v. United States*, 597 F.2d 733, 747 (Ct. Cl. 1979).

In an attempt to support their claim that Steven invented all parts of claim 1 of the '137 Patent, in response Plaintiffs cite to the same December 26, 2010, February 6, 2011, and February 14, 2011 emails from Rabin. Pls.' Resp. at 3–4 (citing Steven Decl. ¶¶ 49, 53, 55). But Plaintiffs' statement of additional facts cites those emails as supporting Steven's involvement in the development of the invention claimed in the '794, not the '137, Patent. *See* PSOAF ¶¶ 3–4. Plaintiffs' statement of additional facts states only that Steven "was extensively involved in the development of the invention claims in the '137 patent," citing several paragraphs of Steven's declaration without specifying within the statement of facts *any* details from the supporting evidence. *Id.* ¶ 4. The Court declines to review each paragraph of Steven's declaration to determine whether they indeed show his involvement in the conception of elements 1(a) through 1(k) of claim 1.

Finally Plaintiffs argue that circumstantial factors considered by the court in *Ethicon*, 135 F.3d at 1464, that corroborated the plaintiff's conception claim also weigh in favor of Plaintiffs: specifically, Cheryl's reliance on Steven's technical expertise, as well as a proposal that Steven and the co-inventors work together.[6] Pls.' Resp. at 4–5 (citing PSOAF ¶¶ 3–4, 9–11). However, as Defendants argue in reply,

---

[6]Plaintiffs also argue that a case cited by Defendants, *Kim v. Kettell*, supports their position, as the court in *Kim* allowed a claim to proceed where the plaintiff "pointed to evidence beyond his own testimony that acknowledge[d] his contribution to the conception of the [relevant] software." Pls.' Resp. at 4 (quoting 694 F. Supp. 3d 1379, 1394 (D. Colo. 2023)). *Kim* was at the motion to dismiss stage, however, so evidence was not required as it is here. *Kim* does not save Plaintiffs' claim.

they adduced evidence that Cheryl also had coding knowledge and did not need Steven's coding knowledge to conceive of the patented inventions. Defs.' Reply at 3–4. And praise and collaboration language, without claim-specific technical disclosure, does not establish co-inventorship; the alleged contribution must be to conception of the claims. *Id.* at 3 (citing *Intellisoft, Ltd. v. Acer Am. Corp.*, 2018 WL 6421872, at *12 (N.D. Cal. Dec. 6, 2018), *vacated on other grounds and remanded,* 955 F.3d 927 (Fed. Cir. 2020) ("But evidence that [plaintiff] discussed and disclosed software ideas is not equivalent to circumstantial evidence of [plaintiff's] conception."); *see also Stern*, 434 F.3d at 1377–78; *Trovan*, 299 F.3d at 1302.

As previously noted, an issued patent carries a strong presumption that the named inventors are correct, and anyone who challenges that presumption must support the challenge with clear-and-convincing evidence and corroborate it under the Federal Circuit's rule-of-reason analysis. *See Pannu*, 155 F.3d at 1349; *Ethicon*, 135 F.3d at 1461. To meet that burden, the alleged co-inventor must offer evidence that independently corroborates a contribution to the definite and permanent idea of the invention, not merely participation in the research effort. *Trovan*, 299 F.3d at 1302. Yet, in this instance, Plaintiffs cite no lab notebooks, source code, technical specifications, or contemporaneous third-party testimony that attribute the conception of any specific claim element to Steven. Without such corroboration, the presumption of correct inventorship stands. Instead of supplying detailed, corroborated evidence showing when and how he conceived each limitation, Plaintiffs offer only general assertions, conclusory statements, and broad descriptions of his

24

programming contributions. Attacking the named inventor's contribution does not prove the challenger's contribution; the latter must be shown with affirmative, corroborated evidence. *Symantec*, 522 F.3d at 1296.

In sum, the Court finds that Plaintiffs have failed to produce the clear and convincing, independently corroborated evidence required to rebut the presumption of correct inventorship. The evidence of inventorship relied on by Plaintiffs lacks the requisite specificity and corroboration to survive scrutiny under *Pannu* and *Ethicon*, and any further inquiry into his recollection or credibility is moot in light of that threshold failure. Where the record consists of conclusory assertions and lacks claim-specific corroboration, summary judgment against the alleged co-inventor is appropriate. *James*, 823 F. App'x at 946, 948–49; *Stern*, 434 F.3d at 1377–78.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' Count IV is granted, as is their motion for summary judgment on Defendants' Amended Counterclaim I granted in part, as to the '137 Patent.

## II. Validity of the Patents – Plaintiffs' Counts VI and VII

Plaintiffs' Counts VI and VII seek declaratory judgments that the '137 and '794 Patents are invalid as obvious at the time of the alleged inventions. *See* FAC. Defendants argue that the Court lacks subject matter jurisdiction over Counts VI and VII, as Plaintiffs lack standing to bring suit. Defs.' Mot. SJ at 9–13. And, even if subject matter jurisdiction exists, the Patents would not have been obvious to a person of ordinary skill in the art (POSITA) at the time of the inventions, and

therefore the Patents are not invalid. *Id.* at 15–18. The Court starts with whether it has subject matter jurisdiction over Counts VI and VII.

For a party to bring an action under the Declaratory Judgment Act, there must be an actual case and controversy under Article III. *Arris Grp., Inc. v. Brit. Telecommunications PLC*, 639 F.3d 1368, 1373 (Fed. Cir. 2011). "The burden is on the party claiming declaratory judgment jurisdiction to establish that an Article III case or controversy existed at the time the claim for declaratory relief was filed." *Id.* The question is whether, "under all the circumstances," there is a substantial controversy between parties with adverse legal interests, of sufficient immediacy and reality to warrant a declaratory judgment. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The Federal Circuit has repeatedly emphasized that declaratory-judgment jurisdiction "generally will not arise merely on the basis that a party learns of the existence of a patent . . . or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380–81 (Fed. Cir. 2007). An "affirmative act" is patentee conduct that can be reasonably inferred as demonstrating intent to enforce a patent (e.g., demand letters, licensing threats, suit against the declaratory-judgment plaintiff or its customers, enforcement communications about the accused products). *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009); *UCP Int'l Co. v. Balsam Brands, Inc.*, 787 F. App'x 691, 698 (Fed. Cir. 2019).

The jurisdictional inquiry focuses on the facts as of the filing date, and post-complaint developments cannot create jurisdiction where none existed at the time of filing. *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008); *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 34 F.4th 1334, 1340–41 (Fed. Cir. 2022).

Plaintiffs' Amended Complaint offers only a conclusory assertion that Defendants "threatened to file" claims or engaged in conduct creating a reasonable apprehension of suit. FAC ¶ 56. But when asked in deposition why he believed an infringement suit was imminent on the '137 Patent, Steven answered: because Cheryl filed the patent application/obtained the patent—and nothing more. *See* Defs.' Mot. SJ at 11–12 (citing DSOF ¶ 36). As stated above, pursuant to *SanDisk* and *Prasco*, the mere existence or issuance of a patent (even one the declaratory-judgment plaintiff believes is wrongful) does not establish a justiciable controversy absent patentee enforcement conduct. *SanDisk*, 480 F.3d at 1380–81; *Prasco*, 537 F.3d at 1337.

Plaintiffs' reliance on a 2014, second-hand statement that their product was "unauthorized" does not move the needle. As Plaintiffs admitted, "unauthorized" meant not approved by the Air Force. Pls.' Resp. DSOF ¶ 38. Such a statement is not a patent enforcement communication, and it predates the issuance of the '137 Patent by years.[7] On this record, Count VI lacks the required adverse legal interests of sufficient immediacy and reality.

---

[7]True, as the Federal Circuit stated in *Danisco U.S. Inc. v. Novozymes A/S*, a court can consider "pre-issuance" conduct as part of the totality of the circumstances, but this one

The analysis is the same for the '794 Patent. Plaintiffs identify no pre-filing demand, threat, or enforcement communication from Defendants concerning the '794 Patent. The only specific fact Plaintiffs cite is, again, a 2014 trade-show comment that Plaintiffs' product was "unauthorized," which Plaintiffs concede meant not Air Force-approved, not patent infringement. Pls.' Resp. DSOF ¶ 38. The '794 Patent did not issue until February 6, 2018, and Plaintiffs point to no patent-enforcement act by Defendants between issuance and the April 27, 2018 initiation of this lawsuit. Absent a patentee affirmative act demonstrating an intent to enforce the '794 patent, there is no Article III controversy. *SanDisk*, 480 F.3d at 1380–81; *Prasco*, 537 F.3d at 1338.

Plaintiffs argue there is no bright-line rule and the Court should consider the parties' history. Pls.' Resp. at 10–11 (citing *MedImmune,* 549 U.S. at 127 (2007); *Danisco U.S. Inc. v. Novozymes A/S*, 744 F.3d 1325, 1330 (Fed. Cir. 2014)). True, no bright-line rule exists, but *MedImmune* and *Danisco* still require adverse legal interests with sufficient immediacy grounded in patentee conduct. In *Danisco*, the patentee's actions—including targeted public statements and enforcement positioning against the plaintiff—created a concrete controversy. 744 F.3d 1325, 1331–32. Here, Plaintiffs identify no analogous patentee actions directed at them before filing.

Rather, without citing to any statements of fact, Plaintiffs argue that Defendants' litigation history—that is, that Defendants "have spent the past 16 years, in state and federal court, litigating every dispute that ever existed between

---

comment, not directed at infringing conduct, is insufficient to create a justiciable controversy. 744 F.3d 1325, 1332 (Fed. Cir. 2014).

the parties[;] Cheryl has brought Steven to court on everything from major issues like custody and support of their children, ownership of their Intellectual Property, and the division of their businesses, to insignificant items such as the manner in which documents should be produced"—supports a finding that a concrete controversy exists. Pls.' Resp. at 9.

But litigious history that is unrelated to patent enforcement does not create a case or controversy. Prior domestic-relations litigation between these individuals does not supply the missing patent-enforcement act nor create the requisite immediacy. *See Prasco*, 537 F.3d at 1340 (even prior patent suits against *others* are insufficient without patentee action directed to the plaintiff and the products at issue); *c.f. Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009) (the patentee initiated direct contact with party seeking declaratory judgment about a specific patent and product, imposed short response deadlines, and refused to negate enforcement—conduct the Federal Circuit deemed an "affirmative act").

And proposed counterclaims and later filings cannot create jurisdiction *nunc pro tunc*. Plaintiffs cite a later proposed counterclaim alleging willful infringement "since at least" the complaint date, and a 2019 memorandum threatening a separate suit. Pls.' Resp. at 11–12. But post-filing allegations do not create jurisdiction if it was lacking at filing. *Mitek*, 34 F.4th at 1340–41 ("post-complaint facts cannot create jurisdiction where none existed at the time of filing"); *Prasco*, 537 F.3d at 1337. To the extent Plaintiffs say these later statements merely describe an earlier period,

they remain attorney statements, not pre-filing patentee enforcement conduct directed to Plaintiffs about the '137 or '794 Patents.

Steven's individual standing theory does not supply the missing controversy. Plaintiffs argue Steven "uses" or "offers to sell" products personally. Pls.' Resp. at 11 (citing 25 U.S.C. § 271(a)). But even if Steven personally engages in such acts, declaratory-judgment jurisdiction still requires a patentee's affirmative act creating a controversy of sufficient immediacy as to him. *SanDisk*, 480 F.3d at 1380–81; *Prasco*, 537 F.3d at 1338. Plaintiffs identify none.

The Declaratory Judgment Act allows a party to avoid the "dilemma of choosing between abandoning rights or risking suit," *MedImmune*, 549 U.S. at 129, but only when an actual case or controversy exists. It does not authorize advisory opinions based on fear that a competitor might sue sometime in the future. *Prasco*, 537 F.3d at 1339–41.

On the undisputed record, there was no pre-filing patentee enforcement conduct directed to Plaintiffs concerning the Patents; the parties' prior divorce-related litigation does not establish immediacy or adverse legal interests under *MedImmune*; and Plaintiffs' reliance on post-filing statements and conclusory fears cannot cure the defect. Accordingly, Defendants' motion for summary judgment on Plaintiffs' Counts VI and VII are granted.

### III. Violations of the Copyright Act – Plaintiffs' Count I

Plaintiffs' Count I alleges copyright infringement under the Copyright Act. *See* FAC. The parties dispute whether Defendants infringed Steven's copyrighted software code.

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). "The owner of a copyright may obtain a certificate of copyright, which is 'prima facie evidence' of its validity." *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914–15 (7th Cir. 2007) (citing 17 U.S.C. § 410(c)).

Defendants argue that they had a royalty-free license to use the NCI software at issue. Defs.' Mot. SJ at 18. They also highlight Steven's testimony that, while he believed it would be difficult for Innova to independently develop code performing the same tasks without copying his work, it would not be impossible. *Id.* (citing DSOF ¶ 41). Plaintiffs respond that Defendants' license was limited in scope. Pls.' Resp. at 14; *see* Pls.' Resp. DSOF ¶ 42. They contend Defendants were only granted permission to sell, service, and support the vision testing software (VTS) products, not a blanket royalty-free license to use the software more broadly. *Id.*; Steven Dep. at 26–27. The parties' competing interpretations of the license—broad royalty-free use versus

limited rights tied to VTS products—frame a factual dispute that cannot be resolved at summary judgment.

Defendants also argue that, even assuming Plaintiffs have a viable copyright claim, they have not submitted damages calculations, so they cannot support a claim for damages. Defs.' Mot. SJ at 19. The Court agrees with Plaintiffs, however, that their election of statutory damages and/or disgorgement of profits obviates the need to prove actual damages at this stage. Pls.' Resp. at 18 (citing 17 U.S.C. § 504(b)). Disputes about revenues, deductible costs, and willfulness go to remedy, not liability, and must be resolved at trial.

Finally, without citing any authority in support, Defendants contend that summary judgment is warranted because Plaintiffs have not set forth any facts of theories about how Plaintiffs were harmed by Defendants' alleged conduct; that is, Plaintiffs have failed to show that a single customer saw the copyright notice, let alone altered their purchase plans based on it. Defs.' Mot. SJ at 19. By failing to develop or support this argument, Defendants have waived it. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.").

Accordingly, Defendants' motion for summary judgment on Plaintiffs' Count I is denied.

## IV. Violations of DMCA – Plaintiffs' Count II and Defendants' Counterclaim VI

In Count II, Plaintiffs allege that Defendants violated the DMCA under 17 U.S.C. §§ 1202(a) and (b) by "scrubbing" NCI's copyright information and

substituting Innova on the splash screen for the VTS. *See* FAC at 5, 8–10. Conversely, Defendants' Counterclaim VI seeks statutory damages for alleged violations of the DMCA, alleging Plaintiffs falsely claimed ownership of the Rabin Cone Contrast Test (RCCT) software in advertising, on NCI's website, and at trade shows. *See* R. 18, Counterclaims.

17 U.S.C. § 1202(a) prohibits knowingly providing false copyright management information (CMI) with the intent to induce, enable, facilitate, or conceal infringement. Section 1202(b) prohibits intentionally removing or altering CMI without authority, where the defendant knows, or has reasonable grounds to know, that doing so will induce, enable, facilitate, or conceal infringement. To prevail, a plaintiff must establish (1) falsity or removal/alteration of CMI, (2) knowledge of that falsity or alteration, and (3) the requisite intent. *See* 17 U.S.C. § 1202(a)–(b).

Starting with Plaintiffs' DMCA claim, Defendants argue that Plaintiffs cannot meet the statutory requirements under 17 U.S.C. § 1202. Defendants contend that all acts complained of were undertaken by Innova, but Plaintiffs have not produced evidence that Innova acted knowingly and with the intent to induce, enable, facilitate, or conceal infringement under § 1202(a), or with the intent to remove or alter CMI under § 1202(b). Defs.' Mot. SJ at 19. Defendants maintain that Plaintiffs have offered no proof of intent. *Id.* at 19–20. Defendants cite no cases in support of their summary judgment motion on Plaintiffs' DMCA claim, and thus the Court finds their arguments to be underdeveloped and waived. *See White*, 8 F.4th at 552. Waiver aside, however, the Court agrees with Plaintiffs that there exists a question of fact.

Plaintiffs respond that Defendants knew Steven owned the copyrights when the splash-screen CMI was altered. Pls.' Resp. at 21 (citing PSOAF ¶¶ 26–27). Plaintiffs argue that the original CMI properly identified Steven as the copyright holder, was displayed each time the software was used, and gave adequate notice of ownership. *Id.*; PSOAF ¶ 24. They contend Defendants knowingly removed that CMI and replaced it with false CMI identifying Innova, creating a factual dispute regarding Defendants' knowledge and intent that precludes summary judgment. *Id.* Moreover, argue Plaintiffs, Defendants cannot prevail because Plaintiffs were declared the rightful copyright owners in a final judgment, which Defendants never appealed. *Id.* at 24. Plaintiffs maintain that asserting ownership of the RCCT copyright cannot be fraudulent when they are, in fact, the copyright holders. *Id.*

In sum, Plaintiffs present evidence that Innova altered or replaced CMI (e.g., splash screens) while aware that Plaintiffs owned the copyrights; Defendants deny ownership and intent. Section 1202 requires knowledge and (for § 1202(b)) "reasonable grounds to know" the alteration/removal would induce, enable, facilitate, or conceal infringement. Both ownership and the double-scienter showing are disputed on this record. Accordingly, Defendants' motion for summary judgment on Plaintiffs' Count II is denied.

Defendants' Counterclaim VI seeks statutory damages for alleged violation of the DMCA, claiming that Plaintiffs falsely claimed ownership of the RCCT software. Defendants argue that Plaintiffs knowingly and repeatedly identified themselves as the copyright owners of the RCCT in advertising, on NCI's website, and at trade

shows, despite knowing Steven developed the code while employed by Innova. Defs.' Mot. SJ at 23. They contend this constitutes the provision and distribution of false copyright management information, entitling them to statutory damages. *Id.* at 23–24.

The same analysis governing Plaintiffs' Count II applies here. To prevail under §§ 1202(a)–(b), Defendants must show falsity or removal of CMI, knowledge of that falsity or alteration, and the requisite intent. As with Count II, those elements rise or fall on the disputed issue of ownership and on whether Plaintiffs acted with the knowledge and intent required by the statute.

Given the same ownership disputes and thin scienter proof at this stage, Defendants have not shown they are entitled to judgment as a matter of law. As such, Defendants' request for statutory damages in a set range per violation also cannot be granted on this record; liability and the number/nature of any "violations" remain disputed, and damages determinations are premature at summary judgment.

Accordingly, Defendants' motion for summary judgment on Counterclaim VI is denied.

## V.     Violations of Lanham Act – Plaintiffs' Count III

Plaintiffs' Count III alleges violations of the Lanham Act, asserting that Defendants falsely claimed copyright ownership by labeling works with Innova's name, causing actual consumer confusion in the vision testing market. *See* FAC. Defendants contend Plaintiffs cannot prove the elements of false advertising, including deception or injury. Defs.' Mot. SJ at 21. Again, apart from one case cited

35

for the elements of a Lanham Act claim, Defendants cite no authority in support of their motion for summary judgment on Count III, and thus the Court finds it to be underdeveloped, and as such, waived. *See White*, 8 F.4th at 552. But again, the Court nonetheless agrees with Plaintiffs that a question of fact exists.

Plaintiffs respond that Defendants falsely represented themselves as copyright owners by placing Innova's name on copyright notices, including on Innova's website, despite prior determinations that Steven owns the copyrights. Pls.' Resp. at 22–23. Plaintiffs argue these statements were made to consumers, were false, and caused actual confusion in the vision testing market, as confirmed by their expert. *Id*.

"To prevail on a deceptive-advertising claim under the Lanham Act, plaintiff must establish that (1) the defendant made a material false statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018).

The parties present conflicting evidence on the first element—whether Defendants made false or misleading statements of fact—such as whether Innova claimed to have developed "all" VTS software and/or to be the copyright owner. Defs.' Mot. SJ at 21; Pls.' Resp. at 22–23. On the second element, Plaintiffs offer evidence of actual consumer confusion in the vision-testing market. Pls.' Resp. at 23. On injury, Plaintiffs plausibly seek injunctive relief and disgorgement, neither of which requires proof of actual damages or an expert report at summary judgment. *Id*. at 18–19. The

absence of a damages expert does not defeat Count III at this stage. Officers may be individually liable under the Lanham Act for acts they authorized, directed, or personally participated in, and whether Cheryl personally participated remains disputed.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' Count III is denied.

## VI. Federal and State Trademark Infringement and Unfair Competition – Defendants' Counterclaims VIII, IX, and X

Defendants' Counterclaims VIII, IX, and X seek damages for federal and state trademark infringement and unfair competition. *See* Counterclaims. Defendants claim that they have long used the marks "Innova Systems," "ProVideo," and "Rabin Cone Contrast Test," and that Plaintiffs' display of these marks at trade shows falsely suggested an affiliation between NCI and Innova, causing consumer confusion and marketplace harm. *Id.* Yet again, apart from citing to one case supporting a general proposition of law, Defendants cite no authority in support of their summary judgment motion, so the Court again finds them to have waived the argument. *See White*, 8 F.4th at 552. Still, again, based on the arguments presented to the Court and the record before it, the Court agrees with Plaintiffs that questions of fact preclude summary judgment on Defendants' Counterclaims VIII, IX, and X.

To prevail on a trademark infringement or unfair competition claim, "a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of

the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001).

Plaintiffs counter that Defendants have not shown their marks are entitled to trademark protection. Pls.' Resp. at 24. Plaintiffs contend that establishing protectability requires fact-intensive evidence, including advertising, sales volume, and consumer perception, which Defendants have not provided. *Id.* Defendants rely largely on length of use. Defs.' Mot. SJ at 24–25. Plaintiffs point out that "length of time by itself is not a determinative factor." Pls' Resp. at 25 (quoting *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 728 (7th Cir. 1998)). Additionally, Plaintiffs point out the absence of evidence on advertising, sales volume, consumer testimony, or surveys. *Id.* On this record, Defendants have not established protectability as a matter of law. The Court therefore need not address whether Defendants have established the likelihood of confusion.

Accordingly, Defendants' motion for summary judgment on Defendants' Counterclaims VIII, IX, and X is denied.

## Conclusion

For the foregoing reasons, the Court grants Plaintiffs' motion to strike Cheryl's reply declaration [214] and grants in part and denies in part Defendants' motion for summary judgment [192]. The Court denies Defendants' motion for summary judgment on Counts I (Copyright Act), II (DMCA), III (Lanham Act), and V (inventorship of the '794 Patent), as well as on Defendants' Counterclaims VI (DMCA) and VIII–X (federal and state trademark infringement and unfair competition). The

Court grants Defendants' motion for summary judgment on Counts IV (inventorship of the '137 Patent), VI and VII (patent validity). It grants in part and denies in part Defendants' motion for summary judgment on Defendants' Amended Counterclaim I, in that it grants the motion as it relates to the '137 Patent and denies the motion as it relates to the '794 Patent. By October 7, 2025, the parties are directed to file a status report indicating: (1) whether the parties would like a referral to the Magistrate Judge for a settlement conference, (2) whether the parties consent to proceeding with trial before the Magistrate Judge, (3) whether the parties consent to a bench trial, (4) the anticipated number of days for trial (accounting for voir dire), and (5) the expected number of witnesses.

Dated: September 23, 2025

United States District Judge
Franklin U. Valderrama